**SO ORDERED.**

**SIGNED this 26 day of April, 2013.**

_____
J. Rich Leonard
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

IN RE:

GENE EXPRESS, INC.,

    Debtor.

CASE NO: 10-08432-8-JRL
CHAPTER 7

_____

| | |
|---|---|
| JAMES B. ANGELL, Chapter 7 Trustee, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | ADVERSARY PROCEEDING |
| ) | NO. 12-00284-8-JRL |
| ACCUGENOMICS, INC., EMAN 1, ) | |
| LLC, RONALD B. MCNEILL, ) | |
| NIKOLAOS V LAZARIDIS, GERALD ) | |
| JOHN VARDZEL, JR., JOHN C. ) | |
| ANDERS, TEDS ENTERPRISES, INC., ) | |
| ALFRED C. POLLOCK, III, PAUL ) | |
| ANTONUCCI JOSEPH LOROSSO, ) | |
| BRYAN PYLES, UNIVERSITY OF ) | |
| ROCHESTER AND UNIVERSITY OF ) | |
| TOLEDO, ) | |
| ) | |
|     Defendants. ) | |

**ORDER**

This matter came before the court on TEDS Enterprises, Inc.'s ("TEDS") motion to dismiss the first cause of action in this adversary proceeding for failure to state a claim upon which relief may be granted, to which Jame

1

s B. Angell ("trustee") has objected. On March 14, 2013, a hearing on the matter was held in Raleigh, North Carolina.

## BACKGROUND

On March 18, 2008,[1] the debtor, Gene Express, Inc., entered into an agreement with the Hansberry Corporation, now known as TEDS, to lease laboratory and office space located at 1410 Commonwealth Drive, Suite 105, Wilmington, North Carolina, 28403 ("the Commonwealth property"). Section 26 of the lease provided that

> [i]f Tenant shall abandon the Premises or be dispossessed by process of law, any personal property belonging to Tenant and left on [sic] the Premises, at the option of Landlord, shall be deemed abandoned, and available to Landlord to use or sell to offset any rent due or any expenses incurred by removing same and restoring the Premises.

Beginning in November 2009, the debtor defaulted on making payments under the lease.[2] Around February 22, 2010, TEDS gave notice of default to the debtor and demanded that the debtor vacate the premises. Sometime during March 2010, TEDS obtained an order of summary ejectment against the debtor. According to the complaint, TEDS proceeded to lock the debtor out of the premises and secure all of the debtor's personal property. Finally, on April 12, 2010, the New Hanover County Sheriff served the debtor with a notice of a writ of possession of the premises.

Thereafter, the trustee asserts that various efforts were made by defendants to remedy the default: around April 19, 2010, defendant Pollock emailed TEDS, stating that the debtor had several projects near completion, asking to store its personal property until the debtor obtained

---

[1] Although the defendant in this proceeding asserts that the lease was executed on February 18, 2008, for purposes of this motion, the court will assume the lease began on March 18, 2008, as indicated by the trustee in his complaint.

[2] According to the complaint, by December 31, 2009, the debtor's balance sheet indicated assets of $1,262,360.63 and liabilities of $3,336,255.05.

2

proper funding, and proposing a payment plan with remedies if the debtor did not perform; around April 21, 2010, TEDS sent the debtor a proposed agreement that stated if the debtor did not perform, the debtor's personal property would be deemed abandoned and could be disposed of; and at least until April 29, 2010, defendant Pollock continued to negotiate with TEDS regarding the use of the premises.

On May 7, 2010, defendant Pollock emailed defendants Vardzel, Lazaridis, LoRusso, and Antonucci and stated that Stephan Kallabis had been making efforts to meet with board members and shareholders in an effort to "eliminate the present shareholders and end up with the company for himself" by "bankrupting the company." The trustee also alleges that around this time, defendants McNeill, Lazaridis, and Vardzel concluded that the debtor was not reorganizable and sought to procure the assets of the debtor free and clear of claims against the debtor and equity holders to recoup the investment of the McNeill family. To this end, beginning around May 24, 2010, defendant Lazaridis began negotiations with TEDS to purchase the assets of the debtor, without disclosing such attempts to the debtor. Thereafter, around June 7, 2010, defendant McNeill formed Eman 1, LLC.

On June 18, 2010, TEDS sold the personal property at the premises to Eman 1, LLC, for the sum of $52,500.00, the approximate amount owed by the debtor (through June 18, 2010) under its lease. The debtor received no notice of said sale. Furthermore, a May 25, 2010 letter from attorney David K. Bowes, representing Global Equity Trading & Finance, Inc., one of the shareholders of the debtor, to defendant Pollock, indicated that the value of the personal property at issue was worth in excess of $1,000,000.00; defendants McNeill and Lazaridis later valued the personal property obtained from the debtor at $300,000.00, while defendant Pollock valued the property at $1,100,000.00.

Petitioning creditors filed an involuntary chapter seven bankruptcy case against Gene Express, Inc., on October 14, 2010. According to the bankruptcy schedules filed at this time, the debtor had assets valued at $1,403,144.00 and liabilities of $7,305,904.00. On November 11, 2012, the bankruptcy trustee filed this adversary proceeding, seeking avoidance and recovery of fraudulent transfers relating to the sale of the personal property, pursuant to 11 U.S.C. §§ 544, 548(a)(1), 550, 551 and the North Carolina Uniform Fraudulent Transfer Act. In response, TEDS filed a motion to dismiss this count of the complaint, countering that the property at issue was abandoned and sold pursuant to a valid Article 9 sale.

## STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires every pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2); Fed. R. Bankr. P. 7008. A party may move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); Fed R. Bankr. P. 7012(b). To demonstrate entitlement to relief and survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement of relief.'"

Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (internal citations omitted). The veracity of well-pleaded allegations in the complaint will be assumed in determining "whether they plausibly

4

give rise to an entitlement to relief." Angell v. BER Care, Inc. (In re Caremerica, Inc.), 409 B.R. 737, 747 (Bankr. E.D.N.C. 2009) (citation omitted).

## ANALYSIS

Section 548(a) of the Bankruptcy Code permits the trustee to avoid a "transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition," provided the transfer involved either actual or constructive fraud. 11 U.S.C. § 548(a). Section 544 of the Bankruptcy Code also allows a claim for avoidance of fraudulent transfer to be brought under North Carolina's Uniform Fraudulent Transfer Act. A cause of action under North Carolina's Uniform Fraudulent Transfer Act may be brought within four years of the alleged fraudulent transfer. N.C. Gen. Stat. § 39-23.9.

In this case, the alleged transfers of the property from the debtor to TEDS and from TEDS to Eman 1, LLC occurred within two years of the date of the filing of the petition; the present action was also filed well within four years of these transfers. Thus, the issue this court must consider as a preliminary matter is whether it is plausible that the transfers as pled involved "an interest of the debtor." See 11 U.S.C. § 548(a).

A. The Debtor Has An Interest In the Property.

Abandonment of personal property by a lessee is a question of fact. Harris v. The Lamar Co., LLC, 2002 N.C. App. LEXIS 2180 (Ct. App. 2002). Here, granting all inferences in a light most favorable to the plaintiff, it is plausible that TEDS, by recognizing the debtor's rights in the property at issue, waived its right to deem the property abandoned. The complaint alleges that despite the legal proceedings, TEDS continued to negotiate with the debtor and proposed conditions, the non-compliance of which would cause TEDS to treat the property as abandoned

in the future.  Therefore, the court finds that the trustee has plausibly claimed that the transfers at issue involved "an interest of the debtor."

B.  The Transfer Involved Actual Fraud.

Section 548 further explains that a transfer of an interest of the debtor within two years of the filing of the petition is avoidable if it was actually fraudulent, or made or incurred "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  11 U.S.C. § 548(a)(1)(A).  Similarly, North Carolina's Uniform Fraudulent Transfer Act provides that an interest of the debtor may be avoided if it was made or incurred "[w]ith intent to hinder, delay, or defraud any creditor of the debtor . . . ."  N.C. Gen. Stat. § 39-23.4(a)(1).  Thus, the analysis regarding a claim for actual fraud under §§ 544 or 548 remains much the same, and the court will focus on § 548.  See Allman v. Wappler (In re Cansorb Indus. Corp.), AP No. 07–6072, 2009 Bankr. LEXIS 3840, at *31 (Bankr.M.D.N.C. Nov. 20, 2009).

In order to survive a motion to dismiss for actual fraud under §548, the trustee's complaint must satisfy the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure, made applicable by Rule 70009 of the Federal Rules of Bankruptcy Procedure.  See Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009; In re Derivium Captial, LLC, 380 B.R. 429, 439 (Bankr. D.S.C. 2006) (citing In re Verestar, Inc., 343 B.R. 444, 459) (Bankr. S.D.N.Y. 2006).  Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

The court finds that the trustee's claims to avoid actual fraudulent transfers pursuant to §548(a)(1)(A) satisfy the particularity requirement of Rule 9(b).  The complaint asserts that by

6

early May 2010, defendants McNeill, Lazaridis and Vardzel sought to procure the assets of the debtor free and clear of claims of the debtor and equity holders in order to recoup the McNeill family investment. Around May 24, 2010, defendant Lazaridis negotiated with TEDS regarding the property and premises; he copied defendants McNeill and Vardzel. He did not, however, disclose to the debtor his association with defendants McNeill and Vardzel or their attempts to take over the business and assets of the debtor. Defendant McNeill thereafter caused Eman 1, LLC to be formed and purchased the property at issue, without notice to debtor. Thus, as the complaint indicates that the transfers were made to hinder, delay, or defraud entities to which the debtor was or later became indebted, the court finds that the allegations in the complaint comply with Rule 9(b)'s pleading requirements for actual fraud.

C. <u>Even if Transfer Did Not Involve Actual Fraud, It Involved Constructive Fraud.</u>

Section 548 also permits the trustee to avoid, based on a theory of constructive fraud, any transfer of an interest of the debtor within two years of the filing of the petition, provided the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation[]" and either

> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. §548(a)(1)(B). The trustee's complaint in this case alleges that the transfers were made for less than a reasonably equivalent value and were made at a time when the debtor was

insolvent.  The court will address these prongs of constructive fraud with a focus on § 548, as analysis under §544 remains much the same.  See Allman v. Wappler (In re Cansorb Indus. Corp.), AP No. 07–6072, 2009 Bankr. LEXIS 3840, at *31 (Bankr.M.D.N.C. Nov. 20, 2009).

      1. The Debtor Received Less than Reasonably Equivalent Value.

Value, as defined in § 548(d)(2)(A), includes the "satisfaction or securing of a present or antecedent debt of the debtor . . . ."  BFP v. Resolution Tr. Corp., 511 U.S. 531, 535-36 (1994) (citation and internal quotation marks omitted).  In evaluating reasonably equivalent value, the Fourth Circuit has emphasized that "[t]he focus is on the consideration received by the debtor, not on the value given by the transferee.  The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of its unsecured creditors."  Harman v. First Am. Bank (In re Jeffrey Bigelow Design Grp., Inc.), 956 F.2d 479 (4th Cir. 1992).  "A large or significant disparity between what the debtor gave and what it received in exchange typically precludes a finding that the debtor received reasonably equivalent value."  Angell v. Endcom, Inc. (In re Tanglewood Farms of Elizabeth City), AP No. 12-00187-8-JRL, 2013 WL 692975, at *4 (Bankr. E.D.N.C. Feb. 26, 2013) (citing 5 Collier on Bankruptcy ¶ 548.05[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2012)).

Here, although the personal property at issue sold for $52,500.00, or the amount owed by the debtor under the terms of the lease, the complaint plausibly alleges that the property was worth well in excess of this amount.  According to the complaint, David Bowes, representing Global Equity Trading & Finance, Inc. valued the property at $1,000,000.00.  Defendant Pollock valued the property at $1,100,000.00.  Defendants McNeill and Lazaridis valued the property at $300,000.00.  Thus, from a purely financial viewpoint, it is plausible that there was a significant disparity between what the debtor gave and received through the transactions.

8

Further, the complaint plausibly alleges that the debtor did not receive reasonably equivalent value through the enforcement of a statutory landlord's lien.  North Carolina law provides a landlord of nonresidential demised premises with a lien on personal property if the tenant has vacated the property.  N.C. Gen. Stat. § 44A-2(e).   Here, however, the trustee asserts that the lien was not enforced according to North Carolina law, which requires tenants to receive notice of the sale.  See id.  While the sale of the personal property occurred around June 18, 2010, the debtor was not informed of the place or date of said sale.  Thus, the court concludes that the debtor may not be deemed to have received reasonably equivalent value through a statutory lien for the purposes of this motion.

Moreover, while TEDS argues that the debtor received reasonably equivalent value from the transfers pursuant to a valid Article 9 security agreement, the court finds this argument unconvincing.  Under North Carolina law, an agreement must contain an adequate description of the collateral to create a valid Article 9 security interest.  N.C. Gen. Stat. §25-9-108.  A description of collateral is sufficient "if it reasonably identifies what is described," id. at §25-9-108(a); see also U.C.C. §9-108 cmt. 2 (2012) ("The test of sufficiency of a description under this section . . . is that the description do the job assigned to it: make possible the identification of the collateral described.").  Examples of sufficient descriptions include identifying the collateral by specific listing, category, quantity, collateral type, computational or allocational formula, or any other method, "if the identity of the collateral is objectively determinable."  N.C. Gen. Stat. §25-9-108(b).  "Supergeneric descriptions," such as "all the debtor's assets" or "all the debtor's personal property" are insufficient.  Id. at §25-9-108(c).

In this case, the description in the lease is "any personal property belonging to Tenant and left of the Premises."  While no case law directly addresses whether such words may create a

9

valid security interest under North Carolina law, the court finds that the language renders the description at issue "supergeneric." An agreement covering "any [of the debtor's] personal property" does not identify collateral in a more meaningful sense than a description covering "all of the debtor's personal property." See N.C. Gen. Stat. §25-9-108(c) (explaining that an agreement covering "all the debtor's personal property" is "supergeneric"). Furthermore, the description in this case appears even less descriptive than those supergeneric descriptions deemed unenforceable under North Carolina law, as it refers to property that may be abandoned in the future, rather than property that is presently identifiable. See, e.g., Gwathmey v. Etheridge, 99 N.C. 571, 571, 6 S.E. 411, 412 (1888) (emphasizing the importance of descriptions which "g[i]ve point and direction to the lien, and identif[y] in an important sense that property to which [they] should operate be effectual").

Nor is the description of the collateral in this case analogous to other agreements that courts have enforced as security interests under North Carolina law. For example, in Telesis Community Credit Union v. Mantiff 1215 Statesville Hospitality LLC, No. 5:09-CV-118, 2010 WL 771947 (W.D.N.C. Mar. 5, 2010), the United States District Court for the Western District of North Carolina considered whether a lease, variously describing the collateral as "all inventory, goods, wares, equipment, fixture, furniture, and all other personalty of Tenant situated in or upon the Property" and "Tenant's personalty now or subsequently located on the property," created an enforceable security interest. Id. at * 2. The court ultimately concluded that the descriptions were sufficient to create a security interest in items later left by the tenant on the premises. See Telesis Community Credit Union v. Mantiff 1215 Statesville Hospitality LLC, No. 5:09-CV-118, 2010 WL 3475471 (W.D.N.C. Sept. 1, 2010). Similarly, in Magers v. Bonds (In re Bonds Distribution Company), Nos. 97-52130C-7W, 98-6044, 2000 WL 33673768

10

(Bankr. M.D.N.C. Mar. 31, 2000), the United States Bankruptcy Court for the Middle District of North Carolina held that a security agreement was created in collateral described as

> all of the personal property, including, but not limited to, the assets identified in Paragraph 2 of the Stock Purchase Agreement dated November 7, 1995, and the various Schedules referenced therein which shall be attached hereto as well as all additional equipment, furniture and fixtures, supplies, inventory, instruments, accounts receivable, wherever located and including, substitutions, additions, replacements, proceeds, and proceeds of proceeds, of any nature and kind, used and unused by the Debtor in the business.

Id. at *5.

Unlike the descriptions enforced in Telesis and Magers, however, the agreement in this case does not couple a broad description of the debtor's "personal property" or "personalty" with other, more specific categories or listings of collateral. Rather, the description here merely references "personal property," a category of collateral which, when used on its own, is insufficient to create a valid security interest under North Carolina law. See N.C. Gen. Stat. §25-9-108(c).

Furthermore, while TEDS argues that the description at issue here is analogous to a description approved by the North Carolina Court of Appeals in Dunham's Music House, Inc. v. Asheville Theatres, Inc., 10 N.C. App. 242, 178 S.E.2d 124 (1970), this reliance is misplaced. In Dunham, the landlord leased premises to the tenants pursuant to an agreement containing the following provision:

> Lessee may not remove any of the furnishings, fixtures or equipment described in Exhibit A attached hereto nor may Lessee remove any furnishings, fixtures or equipment which Lessee may have supplied or installed to replace such furnishings, fixtures or equipment described in Exhibit A. All items not removed as provided shall become Lessor's property.

Id. at 10 N.C. App. 243, 178 S.E.2d 125. In contrast to the collateral referenced in the Dunham agreement, however, the collateral in this agreement is not specifically incorporated by

11

reference; and whereas the description in Dunham detailed separately listed furnishings, fixtures, and equipment of the tenants as subject to the lease, the description here only broadly references "personal property" of the debtor.

Thus, the court finds that as the debtor did not receive reasonably equivalent value from the transfers pursuant to a valid Article 9 security agreement and that according to the complaint, the debtor did not receive reasonably equivalent value from the transfers pursuant to a statutory landlord's lien, the trustee has plausibly stated a claim that the debtor received less than reasonably equivalent value when TEDS transferred its personal property.

    2. The Transfer Occurred While the Debtor Was Insolvent.

The Bankruptcy Code defines insolvency as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). Courts in the Fourth Circuit apply the "balance sheet test," to evaluate insolvency under § 548, which "involves the comparing of the fair market value of the debtor's assets at the time of the transaction with the debtor's liabilities on the same date." Ruby v. Ryan (In re Ryan), 472 B.R. 714, 727 (Bankr. E.D.Va. 2012) (citation omitted). "This court has taken into consideration a debtor's schedules at the time of the petition date in determining the plausibility of a debtor's insolvency at the time of earlier transfers." Angell v. Augusta Seed Corp. (In re Tanglewood Farms, Inc. of Elizabeth City), AP. No. 12-00192-8-JRL, 2013 WL 474704, at *3 (Bankr. E.D.N.C. Feb. 7, 2013); see Angell v. First Eastern, LLC (In re Caremerica, Inc.), AP. No. 08-00157-8-JRL, 2011 Bankr. LEXIS 2429, at *10 (Bankr. E.D.N.C. Apr. 15, 2011).

Based on a review of the pleadings, the court finds that the trustee's complaint contains facts sufficient to show that the transfers were made while the debtor was insolvent.

Specifically, the nature of the debtor's insolvency as of the petition date, as indicated in the debtor's schedules, raises an inference that the debtor's insolvency predated the petition to the time of the alleged fraudulent transfers. Moreover, the complaint also asserts that the debtor was in a similarly indebted state less than six months prior to the transfers at issue. Therefore, the trustee has plausibly asserted that the debtor was insolvent at the time of the transfers.

## CONCLUSION

Based on the foregoing, the court finds that the trustee's complaint states a plausible claim for relief for the avoidance and recovery of fraudulent transfers relating to the sale of the personal property, pursuant to 11 U.S.C. §§ 544, 548(a)(1), 550, 551 and the North Carolina Uniform Fraudulent Transfer Act. Accordingly, TEDS motion to dismiss is **DENIED**.

**END OF DOCUMENT**