**SO ORDERED.**

**SIGNED this 10 day of May, 2013.**

_J. Rich Leonard_

**J. Rich Leonard**
**United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WILMINGTON DIVISION

**IN RE:**

**GENE EXPRESS, INC.,**                                    **CASE NO. 10–08432–8–JRL**

    **DEBTOR.**                                    **CHAPTER 7**

---

**JAMES B. ANGELL, CHAPTER 7**
**TRUSTEE,**

    **PLAINTIFF,**

      **v.**                                    **ADVERSARY PROCEEDING**
                                                         **NO.  12–00284–8–JRL**

**ACCUGENOMICS, INC., EMAN 1, LLC,**
**RONALD B. MCNEILL, NIKOLAOS V.**
**LAZARIDIS, GERALD JOHN VARDZEL,**
**JR., JOHN C. ANDERS, TEDS**
**ENTERPRISES, INC., ALFRED C.**
**POLLOCK, III, PAUL ANTONUCCI,**
**JOSEPH LORUSSO, BRYAN PYLES,**
**UNIVERSITY OF ROCHESTER, AND**
**UNIVERSITY OF TOLEDO,**

    **DEFENDANTS.**

1

## <u>ORDER</u>

These matters came before the court on the motions to dismiss of defendants Accugenomics, Inc. ("Accugenomics"), Eman 1, LLC, Nikolaos V. Lazaridis, Gerald John Vardzel, Jr., John C. Anders, and Ronald B. McNeill. At a hearing on March 14, 2013, in Raleigh, North Carolina, the court heard arguments on these matters and on motions to dismiss filed by defendants TEDS Enterprises, Inc. ("TEDS" or "Hansberry"), Paul Antonucci, Joseph LoRusso, Bryan Pyles, the University of Rochester ("Rochester"), and the University of Toledo ("Toledo"). At the end of the hearing, the court took the matters under advisement. This order addresses only the motions to dismiss filed by Accugenomics, Eman 1, LLC, Lazaridis, Vardzel, Anders, and McNeill.

## I.     BACKGROUND[1]

### A.     The defendants

Accugenomics  is a North Carolina business corporation organized on December 30, 2010. Accugenomics is the successor corporation of Eman 2, LLC, a North Carolina limited liability company organized on October 16, 2010.

Ronald B. McNeill, of New Hanover County, North Carolina, is a shareholder of the debtor. At the time of the filing of the petition, McNeill was the holder of 6.3% of the outstanding shares of the debtor. McNeill and his family, by holding 4,750,000 shares of the debtor, represented the fourth largest group of shareholders. On June 19, 2009, the debtor entered into a subscription agreement with McNeill which provided for the issuance of shares of stock to McNeill. The

---

[1]These facts are a fair recitation of the complaint, which is viewed in a light most favorable to the non-moving party, the trustee. <u>GE Inv. Private Placement v. Parker</u>, 247 F.3d 543, 548 (4th Cir. 2001) ("On a Rule 12(b)(6) motion to dismiss, a court must accept the factual allegations of the complaint as true and must view the complaint in the light most favorable to the plaintiff." (citing <u>Mylan Labs., Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993)).

subscription agreement also contained a provision which stated that in the event the debtor's business failed one of the tests that the debtor was developing, the BCRABL test, would become 100% owned by McNeill.  McNeill did not file a financing statement in the office of the Colorado Secretary of State or otherwise perfect a security interest in the BCRABL test.  McNeill is the sole member-manager of defendant Eman 1, LLC.  Eman 1, LLC is a North Carolina limited liability company which was organized on June 7, 2010.

Nikolaos V. Lazaridis, of New Hanover County, North Carolina, served as president of the debtor until January 31, 2010, after which he became a consultant to the debtor.  Lazaridis's employment with the debtor was the subject of an Employment and  Non-competition Agreement which the trustee alleges was entered into by the debtor and Lazaridis on September 1, 2006.[2] Among other things, the agreement included non-disclosure, non-competition, and non-solicitation provisions.  The non-disclosure portion provided that during Lazaridis's employment and for a reasonable period of time afterwards, not less than three years, Lazaridis would not disclose, use for his or a third party's benefit, or use to the detriment of the company, any proprietary information disclosed or acquired by him during his employment.  The non-competition provision restricted Lazaridis from engaging in, or assisting a person in engaging in, business which was competitive with the activities of the debtor for a period of one year following termination of his employment with the debtor.  The geographic scope of the non-compete was the geographical area of the debtor's activities and business.  The non-solicitation portion restricted Lazaridis's ability to solicit employees, customers, clients, or prospective customers and clients, for a period of one year following his termination of employment with the debtor.

---

[2]Attached to the complaint is an unsigned copy of this employment agreement.

On December 31, 2009, Lazaridis gave thirty days notice of his resignation. The debtor accepted this resignation but reaffirmed that the provisions of the employment contract still applied. Lazaridis signed a consulting agreement with the debtor on February 1, 2010, pursuant to which he began working as a consultant to the debtor.

Two other former officers of the debtor are named as defendants. Gerald John Vardzel, Jr., of Charleston County, South Pleasant, South Carolina, served as a director on the board of directors as well as CEO/Consultant of the debtor until January 31, 2010. John C. Anders, of Boone County, Missouri, served as vice president of the debtor and had signatory authority over the debtor's North Carolina bank account.

TEDS, formerly The Hansberry Corporation, leased to the debtor premises located at 1410 Commonwealth Drive, Wilmington, North Carolina ("premises"). Scott P. Hansberry is the president of TEDS. In his complaint, the trustee refers to "defendant Hansberry." For purposes of this order, the court will assume allegations against Hansberry are directed against TEDS and may refer to the two interchangeably.

In addition to Vardzel, several other defendants served on the board of directors of the debtor. Alfred C. Pollock, III served as the chairman of the board of directors since January 1, 2008. Paul Antonucci and Joseph LoRusso, both of Steamboat Springs, Colorado, were members of the board of directors up to and through the petition date. Bryan Pyles, of Toledo, Ohio, was a member of the board of directors until October 4, 2010. Pyles concurrently served as an associate vice president of the University of Toledo.

The two universities named as defendants are Toledo and Rochester (collectively, "universities"). Toledo is a member of the state university system of Ohio. Rochester is a member

4

of the state university system of New York.  The debtor held licenses to certain patent rights through the two universities.  The license agreement with Rochester was entered into on August 20, 2002, wherein Rochester would receive royalty payments in exchange for the licenses.  The agreement pertaining to the licenses from Toledo was entered into by the debtor and Toledo's predecessor, the Medical University of Ohio at Toledo, on October 11, 2005.  Under this agreement, Toledo was to receive payments and stock in the debtor.

**B.     The debtor**

The debtor, Gene Express, Inc. ("debtor"), was a corporation in the business of genetic research.[3]  Organized under the laws of the state of Colorado, with business operations initially in Ohio, the debtor relocated to New Hanover County, North Carolina in early 2008.  It was in Wilmington, North Carolina, where the debtor had its principal place of business at the time of the filing of the petition.  The debtor's Wilmington laboratory housed the results of the debtor's research.  The debtor leased the laboratory, (also referred to as the "premises"), from TEDS through a lease entered into on May 18, 2008.  The debtor's day to day operations were carried on by its officers and agents in the area, which included Lazaridis, Varzdel, and Anders.

The debtor's board of directors included Pollock, Vardzel,  Antonucci, LoRusso, and Pyles.  Board meetings were infrequent and erratic.   Pollock, as chairman, dominated the board by frequently acting on its behalf and without consulting the other members.  Pollock had control of

---

[3]The business of the debtor was described by Bloomberg Businessweek online as providing genomic data to accelerate and enable drug and molecular diagnostic development.  The description goes on to list tests attributed to the debtor including, but not limited to, LungCentury GX, a gene expression quantification test to identify individuals with the risk of developing lung cancer and BCR-ABL 1, a prognostic test used in the treatment of certain types of leukemia.

a Wachovia bank account in the debtor's name.  Between 2007 and the petition date, Pollock wrote checks payable to himself from that account.  McNeill and Lazaridis have alleged that some or all of these transfers, which totaled over $1.2 million, were improper.[4]

In order to fund its business endeavors, the debtor raised over $11 million from shareholders located around the world.  As a "start up" company, it was known to investors, shareholders, directors, and officers that additional funds might be needed to bring the research to market.

Beginning in 2009, the debtor began having problems paying vendors and payroll.  The debtor's balance sheet for December 31, 2009, showed the value of the debtor's assets was $1,262,350.83 and the amount of its liabilities was $3,336,255.05.  Around the same time, at the end of 2009 and beginning of 2010, the debtor was finalizing some of its research which the debtor believed would bring it some relief from its financial troubles.  The debtor believed its leukemia tests, when completed would result in royalty payments to the company.  Progress had been made on its LungCentury GX tests.  Additionally, in April 2010, the debtor had another test which was expected to hit the market in May 2010.

### C.    The lease transactions[5]

In November 2009, the debtor defaulted in making payments under the lease. On February 22, 2010, TEDS  notified the debtor of the default and demanded that the debtor vacate the premises. The notice of default was emailed to Lazaridis and another individual and was hand-delivered to

---

[4]The recovery of some or all of the transfers made by Pollock is the subject of a separate adversary proceeding.

[5]The court adopts and incorporates the factual recitation set forth in its order in this case addressing TEDS's motion to dismiss.  See Angell v. Accugenomics, Inc. (In re Gene Express, Inc.), No. 12-00284-8 (Bankr. E.D.N.C. Apr. 26, 2013) (order denying TEDS' motion to dismiss).

Lazaridis at the premises.  In March 2010, TEDS obtained an order of summary ejectment against the debtor.  On April 12, 2010, the New Hanover County Sheriff served Lazaridis with notice of a writ of possession of the premises.  Prior to this time, TEDS locked the debtor out of the premises. The debtor's personal property remained inside the premises.  Five days after the writ of possession was served on Lazaridis, Pollock emailed TEDS asking that TEDS store the debtor's personal property until the debtor obtained funding to complete the projects.  In that email, Pollock proposed a payment plan.TEDS sent an agreement to the debtor which provided that if the debtor did not perform, the personal property would be deemed abandoned.  Lazaridis was copied on the correspondence between TEDS and Pollock until April 29, 2010.

Pollock emailed Vardzel, Lazaridis and several of the debtor's directors on May 7, 2010, informing them that an individual, Stephan Kallabis, had been trying to meet with members of the board of directors and shareholders in an attempt to take over the company by putting it into bankruptcy.  While this was going on, the trustee alleges, McNeill, Lazaridis and Vardzel were determining that the debtor was not reorganizable and they themselves sought to procure the debtor's assets for themselves in order to recoup the investment of the McNeill family.  Lazaridis continued communications, as a consultant, with Pollock regarding the business of the debtor. Lazaridis, Vardzel and McNeill did not disclose to the debtor their association with each other or attempts to take over the business.

At the end of May 2010, Lazaridis began negotiating with TEDS to purchase the assets of the debtor located at the premises and enter into a lease of the premises.  On June 7, 2010, McNeill formed Eman 1, LLC.  Eman1, LLC obtained a bill of sale from TEDS on June 18, 2010 which purported to assign rights in the personal property at the premises.  This included the debtor's

personal property.  Eman 1, LLC paid $52,000 for the property, approximately the amount owed by the debtor to TEDS under the lease.  On October 6, 2010 McNeill formed Eman 2, LLC and the assets of Eman 1, LLC were transferred to Eman 2, LLC.  TEDS did not send notices to the debtor which would satisfy the notice requirement of N.C. Gen. Stat. S. 44A-4(f).  TEDS did not account for the sale to Eman 1, LLC until after November 21, 2010.

The trustee states that the personal property sold by TEDS was valued in excess of $52,000.00.  Lazaridis and McNeill later valued the personal property obtained from the debtor at $300,000.00 when negotiating with Toledo regarding the equity in Accugenomics.  In a letter to the board, offering to infuse the debtor with new capital, one shareholder, Global Equity Trading & Finance, Inc., placed a value in excess of $1 million on the property.  Pollock valued the property sold by TEDS at $1.1 million.

In June 2010, Eman 1, LLC began negotiating with Toledo to obtain the rights to the licenses that were in the debtor's name.  These negotiations continued into November 2010.  On October 1, 2010, Toledo sent the debtor a notice of termination of its license rights, effective October 31, 2010. On November 15, 2010, Toledo ceased negotiations with Accugenomics regarding the licenses. Lazaridis also began negotiations with Rochester to obtain the licenses held by the debtor on November 16, 2010.  Earlier in November, on November 4, Rochester sent the debtor a letter purporting to terminate the debtor's licenses due to the bankruptcy.

### D.    The involuntary bankruptcy

The bankruptcy was initiated on October 14, 2010, when McNeill, Lazaridis, Anders and Vardzel ("petitioning creditors") filed an involuntary petition under chapter 7 of the Bankruptcy Code.  On November 12, 2010, the court entered an order for relief subjecting the debtor to the

8

provisions of chapter 7 of the Bankruptcy Code.  In its order, the court appointed James B. Angell ("trustee") as the interim trustee of the debtor.  The trustee filed the complaint on November 11, 2012.

The trustee alleges that the involuntary bankruptcy was a way for the petitioning creditors to take over the business and assets of the debtor.  The petitioning creditors made representations that they were safeguarding the debtor's intellectual property when in fact, according to the trustee, they were working to secure the property for their own benefit.

Lazaridis and Vardzel were ordered by the court, on February 25, 2011, to file bankruptcy schedules and to appear at the debtor's § 341 meeting.  In March 2011, Accugenomics signed a lease with Hansberry to lease the premises.  It was not until the § 341 meeting on April 11, 2011, under direct questioning from the trustee, that Lazaridis, Anders, and Vardzel disclosed their association with Accugenomics or their efforts to obtain the debtor's property.

The trustee has alleged that Accugenomics, McNeill, Lazaridis, Anders and Vardzel have sought to frustrate and delay the bankruptcy process through various actions which the parties have taken.  The parties have failed to notify the trustee and turn over information regarding the debtor's finances; failed to disclose information about the intellectual property of the debtor in time for him to assume or reject license agreements; misrepresented their true intentions to compete with the debtor; urged Toledo not to disclose the possible interests of third parties in the intellectual property of the debtor in order to avoid competitive bidding; and opposed the debtor's efforts to reorganize.

Accugenomics is in the business of gene research in virtually the same capacity as the debtor. The tests which Accugenomics provides were developed in whole or in part through the research and work conducted by the debtor and funded through investments made by the equity holders in

the debtor and creditors of the debtor.  As mentioned above, Accugenomics leases the premises previously occupied by the debtor and employs several principal officers and consultant previously employed by the debtor.  Accugenomics has obtained licenses from Rochester and Toledo which grant patent rights to Accugenomics which are substantially the same rights previously licensed to the debtor.  The trustee believes Accugenomics is contracting with some of the same clients that were former clients of the debtor.

## II.    DISCUSSION

### A.    Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires every pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2); Fed. R. Bankr. P. 7008.  A party may move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b).  To demonstrate entitlement to relief and survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (internal citations, quotation marks and brackets omitted).  The veracity of well–pleaded allegations in the complaint will be assumed in determining "whether they plausibly give rise to an entitlement to relief." Angell v. BER Care, Inc. (In re

<u>Caremerica, Inc.)</u>, 409 B.R. 737, 747 (Bankr. E.D.N.C. 2009) (citation omitted).

**B.      Avoidance and Recovery of Fraudulent Transfers pursuant to 11 U.S.C. § 554, 548(a)(1), 550, 551 and the North Carolina Uniform Fraudulent Transfer Act (N.C. Gen. Stat. § 39-23.1 et seq); N.C. Gen. Stat. § 44A-4(g)**

[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of [the bankruptcy code], the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –
   (1)    the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
   (2)    any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).  In the first cause of action, the trustee seeks to hold Eman 1, LLC and Accugenomics liable for the recovery of the property they received or benefitted from, or the value of the property transferred pursuant to 11 U.S.C. §§ 550(a) and 551.  This cause of action also named as a defendant TEDS, who the trustee seeks to hold liable under N.C. Gen. Stat. § 44A-4(g), 11 U.S.C. §§ 544 and 548, the North Carolina Uniform Fraudulent Transfer Act, in addition to under §§ 550(a) and 551.  The allegations stem from the defendants' actions related to the purported abandonment of personal property of the debtor at the premises to TEDS and the subsequent transfer of the property from TEDS to Eman 1, LLC for $52,000.00.  The trustee asserts that theses transfers constituted fraudulent transfers.

On April 26, 2013, the court entered an order on TEDS' motion to dismiss.  <u>See</u> <u>Angell v. Accugenomics, Inc. (In re Gene Express, Inc.)</u>, No. 12-00284-8 (Bankr. E.D.N.C. Apr. 26, 2013) (order denying TEDS' motion to dismiss).  The court adopts and incorporates the findings in that order.  Based on its conclusion in that order, that the complaint plausibly stated a claim against TEDS, the court finds that the trustee has met his burden against Eman 1, LLC and Accugenomics as well.  The complaint pleads that TEDS sold the property to Eman 1, LLC and that Eman 1, LLC

11

then transferred the property to Eman 2, LLC, the predecessor of Accugenomics.  Based on the facts

contained in the complaint, the trustee plausibly states a claim against Eman 1, LLC and

Accugenomics under 11 U.S.C. §§ 550(a) and 551.  The motions to dismiss the first cause of action

of the trustee's complaint are denied.

### C.    N.C. Gen. Stat. § 75-1.1 Unfair and Deceptive Trade Practices

North Carolina law declares "unfair methods of competition in or affecting commerce, and

unfair or deceptive acts or practices in or affecting commerce" unlawful.  N.C. Gen. Stat. § 75-

1.1(a).  The elements a plaintiff must show are (1) an unfair or deceptive act or practice (2) in or

affecting commerce (3) which damaged the plaintiff.

An act is unfair "when it offends established public policy or is immoral, unethical,

oppressive, unscrupulous, or substantially injurious to consumers." In re Brookers, Inc., 396 B.R.

146, 160 (Bankr. M.D.N.C. 2008).  To show a deceptive act, the plaintiff must "show that the acts

complained of possessed the tendency or capacity to mislead, or created the likelihood of

deception." Id.  Commerce is defined to include all business activities but does not include

professional services rendered by a member of a learned profession.  N.C. Gen. Stat. § 75-1.1(b).

The General Assembly intended the UDTPA "to regulate a business's regular interactions with other

market participants." White v. Thompson, 691 S.E.2d 676, 679 (N.C. 2010).

The trustee complains of two series of events which constitute unfair and deceptive trade

practices.  The first is the acts of McNeill, Lazaridis, Anders, Vardzel, Eman 1, LLC and

Accugenomics in purchasing from TEDS, the personal property of the debtor for their own use

without notice to the debtor, its board of directors or shareholders.  The second involves the

commencement of the involuntary bankruptcy by McNeill, Lazaridis, Anders, and Vardzel and their

12

representations to the trustee and the court.

The court finds that the trustee has met the pleading requirements for the unfair and deceptive trade practice claim. As discussed above in II.B and in the court's previous order, the trustee pleads facts which plausibly give rise to a claim for a fraudulent transfer in the transfer of the debtor's personal property in TEDS's possession to Eman 1, LLC. From the beginning of the bankruptcy, the petitioning creditors stated they were acting to protect the debtor while at the same time transacting business to the debtor's detriment. The purchase of the assets from TEDS, as well as the defendants' actions in placing the debtor in bankruptcy, as set forth in the complaint, plausibly state a cause of action for a violation of the UDTPA. The defendants' motions to dismiss are denied with respect to the second cause of action.

### D.    Successor Liability

The general rule under North Carolina law is that "a corporation that purchases all, or substantially all, of the assets of another corporation is not liable for the old corporation's debts." Becker v. Graber Builders, Inc., 561 S.E.2d 905, 909 (N.C. Ct. App. 2002). The four exceptions to this general rule against successor liability are: (1) where there is an express or implied agreement by the purchasing corporation to assume the debt or liability; (2) where the transfer amounts to a *de facto* merger of the two corporations; (3) where the transfer of assets was done for the purpose of defrauding the corporation's creditors; or (4) where the purchasing corporation is a 'mere continuation' of the selling corporation in that the purchasing corporation has some of the same shareholders, directors, and officers. Id.

The trustee has brought a claim for successor liability against Eman 1, LLC and Accugenomics. In his claim, the trustee alleges that both parties are successors of the debtor and

that exceptions to the general rule apply to enable the parties to be held liable for the debts and investments of the creditors and shareholders of the debtor.  The exceptions that apply, according to the trustee, are that the transfer of assets was done for the purpose of defrauding the corporation's creditors and that the purchasing corporation is a "mere continuation" of the selling corporation.

As stated in the complaint, Eman 1, LLC bought the personal property of the debtor for $52,000.00 from TEDS.  The assets were then transferred to Eman II, LLC.  Eman II, LLC subsequently merged with Accugenomics.  Accugenomics, the surviving entity after the merger, employs substantially the same principal officers and consultants as were previously employed by the debtor.

The facts do not show that Eman 1, LLC or Accugenomics purchased all of the debtor's assets as the court is aware of some of the debtor's property, namely, the patent rights, which were not included in that purchase.  However, the purchase may have been for substantially all of the debtor's property, such to label Eman 1, LLC as a successor.

The complaint sufficiently states allegations that the purchase was done to defraud the corporation's creditors.  Accordingly, the cause of action for successor liability survives the defendants' motions to dismiss.  The defendants' motions to dismiss the third cause of action, for successor liability, are denied.

### E.    Breach of Fiduciary Duty by Vardzel

Vardzel argues that the fourth cause of action of the complaint, seeking damages for breach of his fiduciary duty, fails because the trustee has not alleged facts sufficient to plausibly demonstrate that any breach of his fiduciary duty was the proximate cause of the actual damages, if any, suffered by the debtor.

Under North Carolina's choice–of–law rules, the substantive law of the state of incorporation governs suits arising from "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders . . . ."  Haberland v. Bulkeley, 896 F. Supp. 2d 410, 420, 2012 WL 4788442, at *8 (E.D.N.C. Sept. 26, 2012) (quoting Bluebird Corp. v. Aubin, 188 N.C. App. 671, 680–81, 657 S.E.2d 55, 63 ( N.C. Ct. App. 2008)); N.C. Gen. Stat. § 55–7–47 (stating that "[i]n any derivative proceeding in the right of a foreign corporation, the matters covered by th[e North Carolina Business Corporation Act] shall be governed by the laws of the jurisdiction of incorporation of the foreign corporation . . . .").  Because the debtor is a corporation organized under the laws of Colorado, the court will apply the substantive laws of Colorado in determining whether Vardzel breach his fiduciary duty to the debtor.  See Haberland, 896 F. Supp. 2d at 420.

Section 7–108–401 of the Colorado Business Corporations Act describes the general standards of conduct for directors of a corporation as follows:

(1) Each director shall discharge the director's duties as a director, including the director's duties as a member of a committee, and each officer with discretionary authority shall discharge the officer's duties under that authority:

(a) In good faith;

(b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(c) In a manner the director or officer reasonably believes to be in the best interests of the corporation.

(2) In discharging duties, a director or officer is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:

(a) One or more officers or employees of the corporation whom the director or officer reasonably believes to be reliable and competent in the matters presented;

15

(b) Legal counsel, a public accountant, or another person as to matters the director or officer reasonably believes are within such person's professional or expert competence; or

(c) In the case of a director, a committee of the board of directors of which the director is not a member if the director reasonably believes the committee merits confidence.

(3) A director or officer is not acting in good faith if the director or officer has knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (2) of this section unwarranted.

(4) A director or officer is not liable as such to the corporation or its shareholders for any action the director or officer takes or omits to take as a director or officer, as the case may be, if, in connection with such action or omission, the director or officer performed the duties of the position in compliance with this section.

(5) A director or officer of a corporation, in the performance of duties in that capacity, shall not have any fiduciary duty to any creditor of the corporation arising only from the status as a creditor.

Colo. Rev. Stat. § 7–108–401.  A corporate director must "act with loyalty toward the corporation and with an 'extreme measure of candor, unselfishness, and good faith.'" Kim v. Grover C. Coors Trust, 179 P.3d 86, 91 (Colo. Ct. App. 2007) (quoting Kullgren v. Navy Gas & Supply Co., 135 P.2d 1007, 1010 (Colo. 1943)); see Stat–Tech Int'l Corp. v. Delutes (In re Stat–Tech Int'l Corp.), 47 F.3d 1054, 1059 (10th Cir. 1995) ("Corporate directors . . . act as a fiduciary of the corporation itself." (citations omitted)).

Under Colorado law, to state a claim for breach of fiduciary duty  "a plaintiff must allege that a fiduciary duty existed, the defendant breached that duty, and the breach was the proximate cause of damages." Mandelbaum v. Fiserv, Inc., 787 F. Supp. 2d 1226, 1240 (D. Colo. 2011) (citing Aller v. Law Office of Carole C. Schriefer, 140 P.3d 23, 26 (Colo. Ct. App. 2005)).  The final element, causation, "is satisfied when the plaintiff proves that the defendant's conduct was a substantial

16

contributing cause of the injury." <u>Aller</u>, 140 P.3d at 26 (citing <u>Rupert v. Clayton Brokerage Co.</u>, 737 P.2d 1106, 1112 (Colo. 1987)).

The trustee claims that Vardzel, in his capacity as a member of the board of directors, breached his fiduciary duty to the debtor by failing to exercise the care an ordinary prudent person in a like position would have exercised under similar circumstances and in a manner that he believed to be in the best interests of the debtor. Despite the severity of the debtor's financial problems and the willingness expressed by several investors, including Global Equity Trading & Finance, Inc., in making substantial capital contributions to reorganize the debtor's operations, the board of directors failed to convene a meeting to develop a strategy to preserve the debtor's assets or entertain these proposed infusions of capital. The complaint further alleges that Vardzel breached his fiduciary duty to the debtor by failing to review or authorize distributions Pollock made to himself from the Wachovia bank account during the three–year period preceding the petition date. Vardzel was also one of the petitioning creditors who filed an involuntary petition against the debtor. Vardzel and the other petitioning creditors, according to the complaint, made various misleading representations that disguised their scheme to utilize the bankruptcy process to acquire the debtor's operations and intellectual property for themselves.

In support of the fourth cause of action in his complaint, the trustee relies on <u>Michaelson v. Michaelson</u>, 939 P.2d 835 (Colo. 1997). In <u>Michaelson</u>, a corporation's fifty percent shareholder sued her former husband, who was an officer, director and the remaining fifty percent shareholder, for breach of fiduciary duty. 939 P.2d at 836, 838. Unbeknownst to the plaintiff in <u>Michaelson</u>, the defendant attempted to dissolve the corporation in December 1987 by filing a statement of intent and articles of dissolution with the Colorado Secretary of State that contained the following false

statements: "(1) all shareholders had been given notice of any shareholder meeting and had consented to the dissolution; and (2) the assets of the corporation had been distributed among all the shareholders according to their rights and interests." Id. at 836–37. The court in Michaelson observed that the defendant, as an officer and director of the corporation, "had a fiduciary duty to act in good faith and in a manner he reasonably believed to be in the best interests of the corporation and all of its shareholders, in[cluding the plaintiff.]" Id. at 841 (citations omitted). The court found the record replete with evidence of the defendant's breach of his fiduciary duty to the plaintiff:

> For example, as an officer, director, and controlling shareholder, he allowed parcels of corporate–owned real property to go to a tax lien sale and purchased the property in his own name, without informing [the plaintiff]. He filed false documents with the Secretary of State, wrongfully attempting to dissolve the corporation. Upon the purported dissolution, he failed to make the required pro rata distribution to [the plaintiff].

Id. at 841–42. Similarly in Collie v. Becknell, the Colorado Court of Appeals held that a corporate director's employment of his individual financial resources to acquire one of the corporation's assets constituted a breach of his fiduciary duty "to refrain from intentional activity aimed at allowing a corporation to become insolvent and thereby usurp a corporate opportunity for his own benefit." 762 P.2d 727, 729–30 (Colo. Ct. App. 1988) ("The duty not to usurp a corporate opportunity includes the duty not to engage in enterprises directly in competition with and necessarily having an injurious or detrimental effect on the corporation's business.").

When viewed in a light most favorable to the trustee, the court finds that the allegations advanced in the complaint support a plausible inference that Vardzel owed the debtor a fiduciary duty under Colo. Rev. Stat. § 7–108–401, which was breached when he failed to take any action to protect the debtor's assets, ensure its continued viability and appropriately monitor Pollock's

activities as chairman.  In sum, the trustee has alleged with the requisite plausibility that Vardzel, as a director, breached the fiduciary duty he owed to the debtor, which resulted in the debtor suffering actual damages.  Accordingly, the motion to dismiss the fourth cause of action of the complaint, with respect to Vardzel, is denied.

### F.    Breach of Agreement

In the fifth cause of action listed in the complaint, the trustee brings a breach of agreement claim against Lazaridis in which he alleges that Lazaridis breached the employment agreement which was in place between Lazaridis and the debtor.  The trustee alleges that Lazaridis breached, among other portions of the agreement, section 6 (patents, works and inventions), section 7 (non-disclosure of proprietary information), section 8 (covenants not to compete), and section 9 (non-solicitation).  In the motion to dismiss, Lazaridis argued that North Carolina law governed the contract.  At the hearing, counsel for Lazaridis acknowledged that Colorado law likely governed the agreement; however, he proceeded to argue that under Colorado law, the complaint fails to state a claim, relying on Colo. Rev. Stat. § 8-2-113 for the proposition that Colorado law disfavors non-competition agreements and that even when a non-competition agreement is recognized it must be reasonable in geographic and temporal scope.  Counsel for Lazaridis also argued that the trustee did not sufficiently plead that the agreement was in effect because the agreement attached was an unsigned copy and further that the debtor breached the agreement first when it failed to pay Lazaridis.  Indeed the complaint contends that in 2009 the debtor had trouble paying its payroll but there are no facts contained in the complaint that show the debtor breached the agreement by failing to pay Lazaridis.

The general rule under Colorado law is that "[a]ny covenant not to compete which restricts

the right of any person to receive compensation for performance of skilled or unskilled labor for any

employer shall be void."  Colo. Rev. Stat. § 8-2-113(2).  This rule however does not apply to

"contract[s] for the protection of trade secrets[.]"  Id. § 8-2-113(2)(b).  A trade secret, defined by

Colorado law, is

> any scientific or technical information, design, process, procedure, formula,
> improvement, confidential business or financial information, listing of names,
> addresses, or telephone numbers, or other information relating to any business or
> profession which is secret and of value.  To be a "trade secret" the owner thereof
> must have taken measures to prevent the secret from becoming available to persons
> other than those selected by the owner [.]

Colo. Rev. Stat. § 7-74-102(4). "Under Colorado law, a non-competition agreement that is not

subject to C.R.S. § 8-2-113(2) is still void if it is unreasonable in either duration or geographic

scope."  Energex Enters., Inc. v. Anthony Doors, Inc., 250 F. Supp. 2d 1278, 1283 (D. Colo. 2003)

(citing Nutting v. Ram Southwest, Inc., 106 F. Supp. 2d 1121 (D. Colo. 2000)).

    In Energex, the United States District Court for the District of Colorado denied the

defendant's motion to dismiss a breach of contract claim.  250 F. Supp. 2d 1278.  The contract which

the defendant allegedly breached contained a non-disclosure clause and a non-competition clause.

Id. at 1281.  The defendant only challenged the sufficiency of the breach of contract claim with

respect to the non-competition clause and so the court noted that the breach of contract claim with

respect to the non-disclosure clause would proceed notwithstanding the court's decision on breach

of the non-compete clause.  Id.  The defendant argued that the claim for a breach of the agreement's

non-competition clause failed as a matter of law because the clause was void under Colo. Rev. Stat.

§ 8-2-113(2) and that it was void as it was unreasonable in scope.  Id.

    As a preliminary matter, the court found no basis for applying § 8-2-113 to the agreement;

20

however, the court wrote that even if the contract were an employment contract, § 8-2-113 would not apply to the non-competition provision as the statute does not apply to "any contract for the protection of trade secrets."

> The Agreement, both on its face and based on the context in which it was entered (as alleged in the complaint), is a "contract for the protection of trade secrets." The non-disclosure portion of the Agreement is expressly designed to prevent the disclosure of [the plaintiff's] "Confidential information," defined in the Agreement to include "trade secrets, ... and product, marketing and business strategies." The non-disclosure provisions also restrict's [the defendant's] disclosure of Confidential Information to employees having a "need to know," evidencing the parties' intention to protect [the plaintiff's] trade secrets and other confidential information from unauthorized disclosure. *The non-competition portion of the Agreement compliments these provisions by providing additional protection to [the plaintiff] for having disclosed its trade secrets and other confidential information to [the defendant].*

Energex, 250 F. Supp.2d at 1282 (internal citations omitted) (emphasis added).

The court then turned to the question of whether, even though the statute did not apply, the non-competition agreement was void due to being unreasonable in either duration or geographic scope.

> Whether a particular duration or geographic scope is "reasonable" in non-competition agreement[s] depends on the facts of each case. To determine the reasonableness of a particular agreement, the trial court must first examine the circumstances of the contracting parties to determine whether a restrictive covenant is justified at all, and then examine the specific terms of the noncompetition clause to determine the reasonableness of their effect. . . . *Colorado courts applying this fact-driven test have enforced non-competition agreements with durations extending from six months to perpetuity and geographic scopes ranging from county to nation-wide.*

Id. at 1283 (emphasis added). The agreement in Energex restricted the defendant's actions for a period of ten years in all areas where the plaintiff's "authorized products" were manufactured or sold. Whether the agreement was "reasonable in duration and geographic scope [was] a factual question to be determined based on facts" not yet before the court. Id. Accordingly, at the time of

21

the motion to dismiss, the court found "no basis ... to find the [a]greement's non-competition clause unreasonable under Colorado law." Id.

Here, the trustee has alleged that Lazaridis breached several different sections of the employment agreement. Here, the non-competition provision, which the defendants assert is void based on Colo. Rev. Stat. § 8-2-113 and on general grounds of unreasonableness, appears to be a contract for the protection of trade secrets. Additionally, the determination of whether the duration and geographic scope of the provision were reasonable is a factual question to be determined at a later date. The complaint pleads that an employment agreement was in place which contained provisions concerning non-competition, non-solicitation, and non-disclosure. The complaint states that Lazaridis and other defendants, through various acts, obtained the debtor's assets and now operate a company in the same field as the debtor. Based on the facts pleaded, the trustee has stated, with the requisite plausibility, a claim for breach of contract. Lazaridis's motion to dismiss the fifth cause of action is denied.

### G. Violations of the Automatic Stay

The automatic stay, which arises upon the filing of a bankruptcy petition, enjoins eight specific acts related to the property of the estate or debtor's property. 11 U.S.C. § 362(a). The stay is applicable to all entities. Id. Pertinent to the case at hand is 11 U.S.C. § 362(a)(3) which provides:

> (a) Except as provided in subsection (b) of this section, a [filed] petition . . . operates as a stay, applicable to all entities, of –
> . . .
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]

It appears that the trustee has brought claims against Lazaridis, Eman 2, LLC,[6] and Accugenomics for violating the automatic stay through their negotiations with the universities for the acquisition of licenses owned by the debtor. However, the trustee has not alleged facts that plausibly give rise to a violation of the automatic stay as he has not pleaded facts that show any act to obtain property of the estate. The mere negotiations that the defendants began while the stay was in place were not, in themselves, acts which constitute violations of the stay. When a company that owns intellectual property files bankruptcy it is foreseeable that parties will begin talks to acquire the patent rights which the debtor-company owns. In many instances these talks are necessary to preserve the value of such rights and continue research and development. Accordingly, the trustee did not plead facts that give rise to a violation of the stay as against Lazaridis, Eman 2, LLC, and Accugenomics. The claims set forth in the fifth and sixth causes of action are dismissed as to Lazaridis, Eman 2, LLC and Accugenomics.

## H.    Misappropriation of Trade Secrets

The North Carolina Trade Secrets Protection Act provides that "[t]he owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret." N.C. Gen. Stat.§ 66-153. The elements of an action for misappropriation of trade secrets are "(1) [the defendant] knows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155. A trade secret is

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

---

[6]Eman 2, LLC is not a named defendant in the complaint but rather the predecessor to Accugenomics.

23

      a.      Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by person who can obtain economic value from its disclosure or use; and

      b.      Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat.§ 66-152(3).  Misappropriation means "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret."  N.C. Gen. Stat. § 66-152(1).

In order to properly plead "a claim of trade secrets under the TSPA, 'a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur.'"  River's Edge Pharms., LLC v. Gorbec Pharm. Servs., 2012 WL 1439133 (M.D.N.C. Apr. 25, 2012) (quoting Washburn v. Yadkin Valley Bank & Trust Co., 660 S.E.2d 577, 585 (N.C. Ct. App. 2008)).  In River's Edge, the court denied the defendant's motion to dismiss as the plaintiff pleaded facts sufficient to state a claim for misappropriation of trade secrets.  2012 WL 1439133 at *14 (M.D.N.C. Apr. 25, 2012).  In determining that the pleadings sufficiently stated a claim, the court wrote,

      In support of its claim, Plaintiff alleges that it hired Gorbec to develop know-how and intellectual property exclusively for River's Edge related to the development of its ANDA products, and that such know-how and intellectual property constitutes trade secrets that are owned by Rivers' Edge.  In addition, Plaintiff alleges that such know-how and intellectual property is not commonly known, and that River's edge has taken steps that are reasonable under the circumstances to maintain the secrecy of the know-how and intellectual property.  Plaintiff also alleges that, due to Gorbec's alleged failure to disclose to Plaintiff the know-how and intellectual property developed by Gorbec exclusively for River's Edge, Plaintiff does not know exactly what the trade secrets are, but contends that whatever Gorbec continues to

claim ownership of, in relation to the dozens of projects it has undertaken for River's
Edge, is what Gorbec is accused of misappropriating. Furthermore, Plaintiff alleges
that Gorbec misappropriated the claimed trade secrets by utilizing the trade secrets
for its own benefit, by holding the trade secrets so as to extract additional money
from River's Edge and by threatening to disclose the existence and nature of the
trade secrets to others.

In this case, Plaintiff alleges that it hired Gorbec to develop know-how and
intellectual property exclusively for River's Edge related to the development of its
ANDA products, and that such know-how and intellectual property constitutes the
claimed trade secrets in this case. Based on the alleged relationship between the
parties, whereby Plaintiff alleges ownership over all know-how and intellectual
property associated with the development of the ANDA products by Gorbec and
exclusively for Plaintiff, the Court finds that Plaintiff's identification of the claimed
trade secrets, as the how-how and intellectual property related to that ANDA
development enables both Gorbec and the Court to delineate what Gorbec is accused
of misappropriating. In addition, the Court finds that the Plaintiff has alleged
sufficient facts to support its claim that Gorbec misappropriated the claimed trade
secrets.

Id. at *13-14 (internal quotations omitted).

In Washburn v. Yadkin Valley Bank & Trust Co., the North Carolina Court of Appeals

affirmed the trial court's finding that the defendant's counterclaim for misappropriation of trade

secrets was not sufficiently pleaded. 660 S.E.2d 577 (N.C. Ct. App. 2008). In reaching its

conclusion, the court wrote,

In the present case, Yadkin alleged Plaintiffs acquired knowledge of Yadkin's
business methods; clients, their specific requirements and needs; and other
confidential information pertaining to Yadkin's business. Yadkin further alleged that
this confidential client information and confidential business information constituted
trade secrets as defined by the TSPA and that Yadkin believes Plaintiffs used its
trade secrets on behalf of AF Financial without Yadkin's permission. These
allegations do not identify with sufficient specificity either the trade secrets Plaintiffs
allegedly misappropriated or the acts by which the alleged misappropriations were
accomplished. The identification of the trade secrets allegedly misappropriated is
broad and vague. Yadkin's allegation that it believes Plaintiffs used its trade secrets
is general and conclusory.

Id. at 586.

Here, the trade secrets which the trustee alleges were misappropriated are "the research findings, client and licensor relationships, testing processes, and other business and technical information" of the debtor. The complaint contains pleadings that the defendants, as shareholders, and present or former directors, officers or consultants of and to the debtor, were aware of the trade secrets and sought to appropriate the trade secrets for their own use to the exclusion of the debtor. The debtor had taken reasonable efforts to maintain the secrecy of the information by, among other things, requiring nondisclosure agreements from persons to whom the disclosures were made.

Specifically the trustee alleges that the licensing terms and capital structure of the debtor were used in competing with the debtor over the licenses from Toledo and Rochester. The customer lists were utilized to provide the same goods and services. The terms and conditions of an agreement with an individual named James Willey were used by Eman 1, LLC and Accugenomics to enter a similar agreement with Willey. Eman 1, LLC and Accugenomics had control of the debtor's computers and were able to use the same documents as the debtor in engaging employees and consultants.

The court finds that the trustee has met the pleading requirement. The trustee's complaint identifies trade secrets with sufficient particularity, the research findings, client and licensor relationships, and testing processes, so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur. The trustee pleads facts that plausibly give rise to entitlement to relief for a claim of misappropriation. Accordingly, the motions to dismiss of Lazaridis, McNeill, Anders, Vardzel, Eman 1, LLC, and Accugenomics, are denied with respect to the eighth cause of action.

26

I.      **Avoidance and Recovery of Preferential Transfers Pursuant to 11 USC §§**

        **547, 550 and 551**

Section 547 of the Bankruptcy Code provides that a trustee

may avoid any transfer of an interest of the debtor in property—

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made
>
>> (A) on or within 90 days before the date of the filing of the petition; or
>>
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if
>
>> (A) the case were a case under chapter 7 of this title;
>>
>> (B) the transfer had not been made; and
>>
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.  the transfer had not been made.

11 U.S.C. § 547(b).

The trustee alleges that the transfer of the BCRABL test to Eman 1, LLC constitutes a preferential transfer which is avoidable pursuant to § 547(b) and that McNeill, Eman 1, LLC and Accugenomics are liable to the trustee pursuant to § § 550 and 551.  At issue is a subscription agreement entered into by the debtor and McNeill which provided, among other things, that if the

27

debtor failed, the BCRABL test would become 100% owned by McNeill.  Based on the subscription

agreement and the facts as pleaded in the complaint, there is no indication that any transfer of the

BCRABL test to McNeill was for or on account of an antecedent debt owed by the debtor before

such transfer was made.  Accordingly, the trustee has failed to plead facts upon which relief can be

granted.  The portions of McNeill's, Eman 1, LLC's and Accugenomics' motions to dismiss which

seek to dismiss the ninth cause of action are allowed.

### J.      Intentional Interference with Contractual Relations

Under North Carolina law, tortious interference with a contract has five elements: "(1) a

valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual

right against the third person; (2) the defendant knows of the contract; (3) the defendant intentionally

induces the third person not to perform the contract; (4) and in doing so acts without justification;

(5) resulting in actual damage to plaintiff."  United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 387

(N.C. 1988) (citing Childress v. Abeles, 84 S.E.2d 176 (N.C. 1954)).

### (i)      Lazaridis agreement

With respect to the Lazaridis employment agreement, the complaint plausibly states a claim

for which relief can be granted against McNeill, Anders, Vardzel and Eman 1, LLC.  The allegations

are that a valid contract existed which restricted Lazaridis's ability, among other things, to disclose

information which he obtained during the course of his employment; that defendants, through their

involvement with the debtor, knew of the contract and intentionally and unjustifiably induced

Lazaridis to not perform the contract.  This interference, the complaint alleges, damaged the plaintiff

in an amount greater than $10,000.00.  Because these allegations plausibly state a claim for

intentional interference with contractual relations, the defendants' motions to dismiss the tenth cause

of action are denied.

### (ii)    Toledo license

The eleventh cause of action in the trustee's complaint alleges intentional interference with contractual relations against McNeill, Anders, Vardzel and Eman 1, LLC, with respect to the contract between the debtor and Toledo for licenses to patent rights.

The complaint alleges that Toledo and the debtor had a contractual agreement for the licensing of certain patent rights.  In June 2010, Eman 1, LLC began negotiating with Toledo to obtain rights to the licenses in the name of the debtor.  On October 1, 2010, Toledo sent the debtor a notice of termination of its license rights, effective October 31, 2010.  Negotiations between the defendants and Toledo continued on October 19, 2010 for the acquisition of the debtor's rights in the patents.  On November 4, 2010, Toledo continued to take the position that the rights of the debtor to the licenses were terminated.

The allegations state a claim for intentional interference of contractual relations which is plausible on its face.  Accordingly, the defendants' motions to dismiss the eleventh cause of action are denied.

### (iii)    Rochester license

Similar to the eleventh cause of action, the twelfth cause of action[7] alleges that McNeill, Anders, Vardzel and Eman 1, LLC, intentionally interfered with contractual relations of the debtor and Rochester.  Rochester had a contract with the debtor which it purported to terminate in November 2010.  In November, the defendants were in talks with Rochester to obtain the rights licensed to the debtor by Rochester.  A plausible claim for intentional interference of contractual

---

[7]Numbered by the trustee as the second "Eleventh Cause of Action."

relations has been pleaded here.  The defendants' motions to dismiss the twelfth cause of action for intentional interference with contractual relations are denied.

**III.      CONCLUSION**

As stated above, the motions to dismiss of Accugenomics, Eman 1, LLC, McNeill, Lazaridis, Vardzel, and Anders are **ALLOWED IN PART** and **DENIED IN PART**. As it relates to these specific defendants, the trustee has met the pleading requirement with respect to the first, second, third, fourth, fifth, eight,  tenth, eleventh, and twelfth causes of action.  The defendants' motions to dismiss are denied with respect to those causes of action.   Again, regarding these specific defendants, the trustee has failed to plead facts which plausible give rise to an entitlement of relief for the sixth, seventh, and  ninth causes of action.  The defendants' motions to dismiss are granted with respect to those causes of action.

**END OF DOCUMENT**